Filed 5/5/17
Opinion following transfer from Supreme Court

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>HUMBERTO SALVADOR,<br><br>    Defendant and Appellant. | A142488<br><br>(Contra Costa County<br>Super. Ct. No. 05-12-00815) |

On the evening of December 13, 2008, Jane Doe stepped out of her car and met defendant Humberto Salvador and three other men, who dragged her into a brutalized nightmare. For his participation, defendant was convicted of 15 felonies with 98 enhancements,[1] and sentenced to 425 years and four months to life in state prison.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for partial publication. The portion of this opinion to be deleted from publication are those portions enclosed within double brackets, [[ ]].

[1] Statutory references are to the Penal Code unless otherwise indicated. Defendant was convicted of one count of kidnapping for sexual purposes (§ 209, subd. (b)(1)); one count of kidnapping during a carjacking (§ 209.5, subd. (a)); one count of carjacking (§ 215, subd. (a)); one count of second degree robbery (§§ 211, 212.5, subd. (c)); active participation in the criminal conduct of a criminal street gang (§ 186.22, subd. (a)); two counts of forcible sexual penetration (§ 289); two counts of forcible sodomy in concert (§ 286, subd. (d)(1)); two counts of forcible rape in concert (§ 264.1, subd. (a)); and four counts of forcible oral copulation in concert (§ 288a, subd. (d)(1)).

Each of the two kidnapping counts, the carjacking count, and the robbery count included allegations found true by the jury that the offense was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)), and involved the personal use of a deadly

1

Defendant contends the testimony of the prosecution's expert on criminal street gangs was based on improper hearsay material, and that defendant's cross-examination was unduly restricted.  Defendant also contends the trial court erred when it instructed the jury that defendant's possible intoxication was not relevant to the issue of whether he formed the specific intent required for conviction on the kidnapping counts and two other charges where he was alleged to have aided and abetted others.  Finally, defendant contends the trial court erred when it imposed consecutive ten-year gang enhancements terms on the ten counts carrying indeterminate life terms under section 667.61, the so-called "One Strike" law.

---

weapon (§ 12022, subd. (b)(1)) and the personal infliction of great bodily injury (§ 12022.7, subd. (a)).

The gang participation count included sustained allegations of the personal use of a deadly weapon and the personal infliction of great bodily injury.

Each of the two forcible sexual penetration counts included sustained allegations that it was a hate crime (§ 422.75) and that defendant committed the offenses for the benefit of a criminal street gang, and while he was armed with and personally used a deadly weapon (§§ 12022, subd. (b)(1), 12202.3, subd. (b)).

Each of the two forcible sodomy counts included sustained allegations that it was a hate crime and committed in concert (§ 422.75, subd. (b)); that defendant was armed with and personally used a deadly weapon, and personally inflicted great bodily injury (§§ 667.61, subd. (d)(6), 12022.7, 12022.8); that the offense involved a kidnapping that substantially increased the risk to the victim (§ 667.61, subds. (d)(2)); and that it was committed for the benefit of a criminal street gang.

Each of the two forcible rape counts included sustained allegations that it was a hate crime and committed in concert; that defendant was armed with and personally used a deadly weapon; that the offense was committed for the benefit of a criminal street gang; and that the offense involved a kidnapping that substantially increased the risk to the victim.

Three of the four forcible oral copulation counts included sustained allegations that it was a hate crime and committed in concert, for the benefit of a criminal street gang; that defendant was armed with a deadly weapon; and that the offense involved a kidnapping that substantially increased the risk to the victim.  In addition, the fourth count also included the sustained allegation that during the commission of the offense defendant personally used a deadly weapon.

Having reconsidered defendant's first contention in light of *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*), we conclude there was some improper expert testimony heard by the jury, but it was harmless. We further conclude that all other claims of trial error are without merit. In the published portion of this opinion, we conclude that the inescapable logic of *People v. Lopez* (2005) 34 Cal.4th 1002 establishes that the gang enhancements are not authorized by section 186.22, and must be stricken. We remand for resentencing, but otherwise affirm the judgment of conviction.

[[Begin nonpublished portion]]

## BACKGROUND

The parties' briefs disclose a thorough knowledge of the trial record. Defendant does not contend the evidence in that record is insufficient to support any of his convictions. Defendant did not testify or call witnesses on his behalf, thus narrowing the scope for clash or differing interpretation. In any event, most of the salient details are not in material dispute, so not every detail need be reiterated here. The following narrative abbreviates the trial record in the light most favorable to the prosecution and in support of the judgments. (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.)

Defendant was a senior member of the Sureno criminal street gang, who lived in Richmond. On the evening of December 13, 2008, Josue Gonzalez was in San Rafael, on his way to church, when he received a telephone call from defendant, who said: "Let's go do a couple of carjack[s], licks [break-ins, robberies]." Gonzalez changed his plans, and telephoned Darryl Hodges and Robert Ortiz—both of whom Gonzalez had been instructing about gang rules and practices—to meet him in Richmond. Gonzalez had been a Sureno for nine years, but was still only a junior member of Surenos, so he felt he had no choice but to obey defendant. Hodges (age 16) and Ortiz (age 15) wanted to become Surenos, and thus would have even less inclination to disobey defendant.[2] Gonzalez, Hodges, and Ortiz had previously gone carjacking with defendant. Gonzalez, Hodges, and Ortiz met defendant in Richmond which, because it was "his

---

[2] Ortiz lived next door to defendant.

3

neighborhood," increased defendant's authority. They drank beer, and set out. They broke into a number of cars, but "just took what was inside." The four were congregated by one of those vehicles when the victim drove up.

The victim testified that when she drove up to her Richmond home after work, she noticed a group of four men—three Latino and one Black—standing near a parked car. After she parked her car, she called her father on a cell phone "[b]ecause . . . I was scared." While she was talking to her father, and walking to her house, defendant[3] approached, and, in Spanish, demanded money and her keys. The victim told the man she had no money. Defendant grabbed the phone, smashed her head with a flashlight, and repeated "give me everything you have." The victim surrendered her money, wallet, and keys, but refused defendant's demand that she take off her clothes. After being hit for a second time in the head with the flashlight, she began disrobing.

Down to her underwear, the victim hesitated to go further until defendant "lifted his hand up as if he were going to hit me again if I didn't take it off." When the victim was naked, defendant ordered her to "get on the ground." After Gonzalez picked up the victim's clothing, defendant—in the victim's words—"started to touch me from behind." Defendant then digitally penetrated her anus for two or three minutes, ignoring her protest that it was hurting her. Defendant then told her get up, marched her over to her car, and told her to get in.[4]

When the victim handed over her car keys, defendant had thrown them to Ortiz. Ortiz stayed in the car with Hodges and Gonzalez until defendant brought over the victim to her car, and commanded Ortiz to start the engine. Once the car was underway, with the victim in the middle of the back seat, defendant told the driver (Ortiz), "Take us somewhere where all of us can have a good time." Defendant asked the victim "if I liked men." "I told him yes" because "I thought he would kill me . . . ." After defendant

---

[3] The victim remembered the man as Latino, recalled some physical details, but at trial did not identify defendant. That identification was made by Gonzalez.

[4] The jury was advised that defendant had three convictions for felony car theft (Veh. Code, § 10851).

4

"asked me if I was sure that I liked men," he told her "that if I did like men that I needed to show him."[5] Defendant unbuttoned his pants, and said, "Give me some head."

The victim testified that defendant asked her did she "like dick." Defendant "grabbed me by the head and pushed me towards his part," and forced her to put her mouth over his erect penis. "He . . . told me we were going to go to a place to have fun." Gonzalez heard defendant say "You like it you know. Do you like it?"

After about five blocks, the car stopped at the abandoned home of a Sureno in "a burned-out apartment complex." After her car had been driven into the carport, defendant ordered the naked victim out. Once out of her car, defendant "told me to bend over," and then "[h]e penetrated me" "[i]n the backside." "I yelled, and I told him that it hurt me," whereupon defendant taunted: "See, you like men. I'm going to set you straight." And, "You like boys. Tell me you like boys."

Defendant then ordered the victim underneath an exterior staircase. Again she was sodomized on her feet, while defendant kept asking "if I was sure that I liked men." While still standing behind the victim, defendant raped her. While doing so, he again inquired "[w]hether . . . I liked it." Defendant ordered the victim to her knees and to orally copulate him again. His comments this time were "whether . . . I liked men and that I should show him that I did," and "You like sucking dick, don't you?" When finished, defendant told Gonzalez "It's your turn next." Gonzalez refused, but Ortiz did not, forcing the victim to orally copulate him. Defendant and Gonzalez drove away in the victim's car, about the time Hodges was forcing the victim to orally copulate him.

The victim's ordeal ended when Ortiz and Hodges left on foot. Disregarding their command not to move, she ran to a nearby home, and police were summoned.

Defendant drove himself and Gonzalez for a number of blocks, when they abandoned the victim's car. Defendant's pants and shirt were soaked in blood. He removed them, and set them afire in the middle of the sidewalk.[6] Defendant and

---

[5] It is unclear precisely how defendant came to identify the victim as a lesbian.

[6] The victim's ID was found in the partially burned pants.

5

Gonzalez were picked up by a cousin of defendant, who drove them away. Gonzalez told the jury that rape was not tolerated by the Surenos: the prohibition against it was almost as strong as the ban on snitching.[7]

Defendant's DNA was found in swabs taken from the victim. Defendant's fingerprints, and the victim's blood, were found on the flashlight that was found in the victim's car.

Richmond Police Detective Reina was one of the two prosecution expert witnesses who testified during the prosecution's case-in-chief on criminal street gangs, including the Central Side Locos ( ), a subset of the Surenos. Reina testified that "CSLs were formed . . . in the early '90s"; that defendant was one of "the founding individuals"; that in about 2000 "their numbers started to diminish, started to decline. In 2008, they had approximately . . . ten members"; and that "in December of 2008" the CSLs were one of "the subsets . . . of the Sureno criminal street gang" that were "operating together under the umbrella of Surenos." In Reina's opinion, the CSLs met the statutory definition of a criminal street gang,[8] and defendant was an active participant, as were Ortiz and Hodges.

---

[7] The jury learned from Gonzalez that he had been "arrested for this offense" on January 1, 2009; that he had been incarcerated up to the time he testified in December 2013; and that he had not been promised anything for his testimony. Gonzalez testified that "ever since I caught this case," he considered his membership in the Surenos at an end.

The jury did not learn that Hodges and Ortiz resolved the charges against them prior to defendant's trial. In 2011, Hodges entered a plea of no contest to one count of forcible oral copulation in concert, and admitted some enhancements, and was sentenced to 24 years in state prison. Ortiz was set to be tried with defendant, but, as the joint trial was starting, the trial court—with the prosecution's concurrence—granted Ortiz's motion for separate trials. In January 2014, shortly after defendant's trial ended, Ortiz entered pleas of no contest to forcible oral copulation in concert, forcible rape in concert, and carjacking, for which he would be sentenced to 31 years in state prison. Gonzalez entered pleas of no contest to one count of carjacking, and three counts of second degree robbery, but the ultimate disposition is not shown by the record on appeal.

[8] Subdivision (f) of section 186.22 defines "criminal street gang" as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in . . . subdivision (e), having a common name or common identifying sign or

6

The following occurred on Reina's cross-examination:

"Q. . . . So it's fair to say that . . . you're not sure who [of the CSLs] was around in 2008?

"MS. SMITH: Objection. Misstates his testimony.

"THE COURT: Sustained.

"BY MS. FULLERTON:

"Q. Well, who was around in 2008 other than my client and his two brothers that you know were there and around in 2008?

"MS. SMITH: Objection. Relevancy.

"THE COURT: Sustained.

"MS. FULLERTON: It goes to the whole gang thing. I mean, if there were members that were actually—

"THE COURT: Come forward.

"(Whereupon, an off-the record discussion was held at sidebar between Court and counsel.)

"BY MS. FULLERTON:

"Q. When you were talking about the 50 early on, you said that a lot of those people have gotten locked up, correct?

"A. Yeah, some of them did get locked up, yes.

"Q. And some of them just moved out of the gang life?

"A. Correct.

"Q. Some moved out of the area maybe and went to a gang life someplace else?

"A. Yes.

"Q. And that left you, and correct me if I'm wrong, with 10 active gang members on the street in 2008?

"MS. SMITH: Objection. Compound.

---

symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity."

"THE COURT: Sustained.

"BY MS. FULLERTON:

"Q. How many active gang members of CSL were on the street in 2008?

"MS. SMITH: Objection. Relevancy.

"THE COURT: Overruled.

"THE WITNESS: Approximately 10.

"BY MS. FULLERTON:

"Q. And of those approximate 10, the three that you know about for sure are my client and his two brothers, correct?"

"A. Correct."

The other expert was San Pablo Police Sergeant Palmieri, who worked with Reina in collecting information about the CSL in Richmond. Sergeant Palmieri did not reiterate Detective Reina's testimony; his apparent allotted role was to answer hypothetical questions as to whether the repugnance for rape (see text accompanying fn. 7, *ante*) could be overridden by gang discipline and respect for hierarchy that would compel junior gang members to participate, not challenging the conduct and orders of a senior member, thus making the junior members active participants in an offense committed "for the benefit of, in association with, or at the direction of a criminal street gang."

Defendant called no witnesses on his behalf.

Defense counsel's closing argument to the jury essentially conceded many of the substantive crimes alleged but insisted that defendant was a solo actor. Thus, by challenging whether there was sufficient credible evidence that Gonzalez, Ortiz, and Hodges had the mental state to be aiders and abettors, counsel hoped to persuade the jury the crimes had not been committed in concert, and not for a hate-motivated or gang-related purpose. And the blows to the victim's head did not qualify as great bodily injury. The defense conceded that defendant was a CSL member in 2008.

8

# REVIEW

## Evidentiary Error

In our initial opinion, we analyzed defendant's claims relating to the prosecution's gang expert witnesses as follows:

Defendant's first claim of error requires an understanding of how a criminal street gang is defined. The governing statutory language is that " 'criminal street gang' means any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in . . . subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (§ 186.22, subd. (f).)

The relevant caption in defendant's brief states: "The trial court erred regarding the gang officer's testimony (1) when it admitted—for the truth—hearsay evidence which helped form the basis for the officer's opinion, and (2) when it improperly restricted his cross-examination." This contention has several component arguments.

(1) Defendant submits that the prosecutor agreed not to introduce certain "hearsay statements" from either Detective Reina or Sergeant Palmieri, and then broke that agreement in these particulars: "[T]he prosecutor caused officer Reina to testify that separately tried co-defendant Ortiz admitted that he was a Sureno. [Citation.] Then the prosecutor caused officer Palmieri to testify that McLenehan [*sic*] admitted that he was a CSL member. Then the prosecutor caused officer Reina to testify that Manuel Manzo admitted he was a CSL member. [Citation.] Those statements were all hearsay. The admission of such hearsay testimony was error. It violated Appellant's 6th and 14th Amendment cross-examination rights, because those statements were testimonial, and because neither Ortiz, nor McLenehan [*sic*], nor Manuel Manzo testified. *Crawford v. Washington* (2004) 541 U.S. 36, 52 [(*Crawford*)]. Accordingly, that testimony should have been barred pursuant to the defense [in limine] motion."

(2) In addition, the prosecutor's conduct amounted to misconduct.

Several significant details must be added to defendant's narrative.

9

First, we are not considering the actual violation of a court order. The court refused to grant the defense's in limine request that "their statements be kept out" because "this is more of a trial issue than an in limine, and I say that because I don't know how the questioning of the expert is going to go. I know that Ms. Smith [the prosecutor] is not going to raise the issue of the codefendant . . . [Ortiz's] statements. So it may be that . . . you can ask to approach the bench and we can talk about it, and I think that's how we're going to do it. We'll see how that happens."

Second, and most importantly, when the prosecutor supposedly "violated" her representation—supposedly by eliciting testimony from Reina that Ortiz "admitted to being a Sureno," that McClenahan admitted to being a Sureno and a CSL, and that Manzo "told me himself" that he was a gang member—there was no objection by the defense. In fact, when Detective Reina testified on direct examination about gang-related information he gleaned from speaking with active gang member Anthony Salazar, there was no objection by the defense. Nor does the trial transcript show any objection by the defense when, on direct examination, Reina testified about information he gained about the Surenos and CSLs from speaking with active CSL member Joseph McClenahan. Or when Reina testified on direct examination about active CSL member Manuel Manzo, defendant's step-brother. Or when Reina testified about what he learned from Ortiz's possessions. Moreover, most of the questioning was about the significance of the tattoos worn by Salazar, McClenahan, and Manzo, and what Reina learned from Ortiz's cell phone.

Third, when Detective Reina uttered two of the statements defendant now condemns, it was in response to questions seeking his expert opinion. On the face of it, this was proper. It is an established principle that experts may base opinions on inadmissible hearsay, so long as the hearsay is not admitted for its truth. (*People v. Gardeley* (1996) 14 Cal.4th 605, 618–619.) If defendant thought this principle was at

10

risk of being ignored, he was free to ask for an instruction reminding the jury of the limited use that could properly be made of Reina's statements.[9]

In sum, if there was a breach of the prosecutor's agreement, the defense did not protest it with a timely and specific objection to preserve the issue for review.[10] (Evid. Code, § 353, subd. (a).) The same is true for the claimed misconduct by the prosecutor. (*People v. Thomas* (2011) 51 Cal.4th 449, 492.)

(3) Defendant concludes his first contention by claiming the trial court violated his constitutional right of confrontation by restricting his cross-examination of Detective Reina, as quoted above (pp. 7–8, *ante*), in order that he could disprove the membership of McClenahan and two others (Ramon Cruz and Hector Sin Charon). Not so.

---

[9] Defendant presumes this limitation was ignored, hence his claim of constitutional error. (See *People v. Hill* (2011) 191 Cal.App.4th 1104, 1131 ["we must follow *Gardeley* and the other California Supreme Court cases in the same line of authority. We conclude that the trial court here properly determined that the challenged basis evidence related by Chaplin was not offered for its truth but only to evaluate Chaplin's opinions. Therefore, its admission did not violate the . . . confrontation clause." fn. omitted].) We are not permitted to presume error, constitutional or otherwise. (E.g., *People v. Giordano* (2007) 42 Cal.4th 644, 666; *People v. Douglass* (1893) 100 Cal. 1, 4.)

[10] Even if the prosecutor had elicited evidence in breach of her agreement, defendant could not show prejudicial error. The apparent premise of his contention is to disqualify Salazar, McClenahan, and Manzo from being counted as among the ten or so current CSLs. But defendant does not dispute, as quoted above, that *he* elicited from Detective Reina that he and his two brothers were active CSL members "in 2008." As this is the statutory minimum, the disqualification of others by demonstrating their incarceration would not prevent conviction under section 186.22. Moreover, Gonzalez, Ortiz, and Hodges could still be counted even if they were not formal CSL members. (See *People v. Johnson* (2013) 57 Cal.4th 250, 259 [" 'A person who is not a member of a gang, but who actively participates in the gang, can be guilty of violating section 186.22 . . . .' "]; *People v. Albillar* (2010) 51 Cal.4th 47, 67–68 ["The enhancement set forth in section 186.22(b)(1) . . . . does not depend on membership in a gang at all. Rather, it applies when a defendant has personally committed a gang-related felony with the specific intent to aid members of that gang."].) Indeed, they could still be counted even if they were incarcerated at the time of the charged offenses. (See *People v. Merriman* (2014) 60 Cal.4th 1, 25; *People v. Gonzales* (2015) 232 Cal.App.4th 1449, 1465 ["After his arrest, defendant asked to be placed in the jail housing unit for active Norteno gang members. This evidence was sufficient to show that defendant was a Norteno gang member."]; *People v. Velasquez* (2007) 152 Cal.App.4th 1503, 1509.)

" ' "[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby, 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.' " [Citations.] However, not every restriction on a defendant's desired method of cross-examination is a constitutional violation. Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance. [Citations.] California law is in accord. [Citation.] Thus, unless the defendant can show that the prohibited cross-examination would have produced "a significantly different impression of [the witnesses'] credibility" [citation], the trial court's exercise of its discretion in this regard does not violate the Sixth Amendment. [Citation.]' [Citation.]" (*People v. Virgil* (2011) 51 Cal.4th 1210, 1251.)

Defendant again presumes the occurrence of constitutional error. (See fn. 9, *ante*.) All the record shows is that a number of prosecution objections were sustained by the court. Defendant makes no genuine attempt to show that those rulings were erroneous. Collectively, the rulings do not establish anything like a restriction of legitimate cross-examination, much less an improper restriction of constitutional magnitude. Again, there is nothing in the record like a timely response, or an offer of proof that would preserve the issue for review. (Evid. Code, § 354, subd. (a).) Defendant states "the issue here was whether there were three or more active members . . . ." of the CSLs in 2008, but the issue really was not open to further development because defendant had already obliquely established the point ("Q. [t]he three that you know about for sure are my client and his two brothers, correct?"[11] "A. Correct."). Even now, defendant looks to disprove only the 2008 membership of others besides Salvador and his brothers. Thus,

---

[11] Actually, the references is to defendant's stepbrothers, Manuel and Eduardo Manzo. (See fn. 13 and accompanying text, *post*.)

12

the trial court was, if anything, exercising its " 'wide latitude in restricting cross-examination that is … of marginal relevance.' " (*People v. Virgil*, *supra*, 51 Cal.4th 1210, 1251.)  Defendant has not established that further cross-examination would have given the jury " ' "a significantly different impression of [Reina's] credibility." ' " (*Ibid*.)

The preceding analysis was in our initial opinion filed in February of last year. The California Supreme Court granted review and held the matter for decision in *Sanchez*.  When the opinion in *Sanchez* was filed, the cause was remanded for our reconsideration in light of *Sanchez*, *supra*, 63 Cal.4th 665, a decision involving experts providing gang-related testimony and the confrontation clause principles of *Crawford, supra,* 541 U.S. 36.  The parties filed supplemental briefing to aid our reconsideration.[12]

The *Sanchez* court was addressing the problem with experts and what it called "case-specific facts."  Existing law was summarized as follows:  "[A]n expert has traditionally been precluded from relating *case-specific* facts about which the expert has no independent knowledge.  Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried.  Generally, parties try to establish the facts on which their theory of the case depends by calling witnesses with personal knowledge of those case-specific facts.  An expert may then testify about more generalized information to help jurors understand the significance of those

---

[12] The remand order from the Supreme Court, and our order for supplemental briefing, was limited to the application of *Sanchez*.  However, in his supplemental briefs, appointed counsel for defendant ranges far beyond this limitation to advance new reasons why the expert testimony of Detective Reina and Sergeant Palmieri should have been excluded, and to reargue his claims of prosecutorial misconduct and violation of the trial court's supposed ruling.  These arguments will be ignored because they were addressed in our initial opinion, and allowing defendant to reargue them would exceed the single-issue scope of the Supreme Court's remand order.  Specifically, we do not address defendant's efforts to insert *People v. Prunty* (2015) 62 Cal.4th 59 and *People v. Elizalde* (2015) 61 Cal.4th 523 into this appeal because neither of these decisions are mentioned in the Supreme Court orders granting review or remanding the cause to us for "reconsideration in light of the decision in *People v. Sanchez* (2016) 63 Cal.4th 665."

case-specific facts.  An expert is also allowed to give an opinion about what those facts may mean.  The expert is generally not permitted, however, to supply case-specific facts about which he has no personal knowledge."  (*Sanchez, supra*, 63 Cal.4th 665, 676.)

But *Crawford* and succeeding decisions have significantly reduced the scope of hearsay that is now compatible with the constitutional principle that a criminal defendant "shall enjoy the right . . . to be confronted with the witnesses against him."  (U.S. Const., 6th Amend.)  *Crawford* called for a new approach.  Accordingly, the court adopted the following rule:  "When any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay.  It cannot logically be maintained that the statements are not being admitted for their truth.  If the case is one in which a prosecution expert seeks to relate *testimonial* hearsay, there is a confrontation clause violation unless (1) there is a showing of unavailability and (2) the defendant had a prior opportunity for cross-examination, or forfeited that right by wrongdoing."  (*Sanchez, supra*, 63 Cal.4th 665, 686, fn. omitted.)

"In the present case, when the gang expert testified to case-specific facts based upon out-of-court statements and asserted those facts were true because he relied upon their truth in forming his opinion, he was reciting hearsay.  Ordinarily, an improper admission of hearsay would constitute statutory error under the Evidence Code.  Under *Crawford,* however, if that hearsay was testimonial and *Crawford*'s exceptions did not apply, defendant should have been given the opportunity to cross-examine the declarant or the evidence should have been excluded.  Improper admission of such prosecution evidence would also be an error of federal constitutional magnitude."  (*Sanchez, supra*, 63 Cal.4th 665, 685, fn. omitted.)

"Gang experts, like all others, can rely on background information accepted in their field of expertise under the traditional latitude given by the Evidence Code.  They can rely on information within their personal knowledge, and they can give an opinion based on a hypothetical including case-specific facts that are properly proven.  They may also rely on nontestimonial hearsay properly admitted under a statutory hearsay

14

exception. What they cannot do is present, as facts, the content of testimonial hearsay statements. '[T]he confrontation clause is concerned solely with hearsay statements that are testimonial, in that they are out-of-court analogs, in purpose and form, of the testimony given by witnesses at trial.' [Citation.] Thus, only when a prosecution expert relies upon, and relates as true, a *testimonial* statement would the fact asserted as true have to be independently proven to satisfy the Sixth Amendment." (*Sanchez, supra*, 63 Cal.4th 665, 685.)

"In light of our hearsay rules and *Crawford,* a court addressing the admissibility of out-of-court statements must engage in a two-step analysis. The first step is a traditional hearsay inquiry: Is the statement one made out of court; is it offered to prove the truth of the facts it asserts; and does it fall under a hearsay exception? If a hearsay statement is being offered by the prosecution in a criminal case, and the *Crawford* limitations of unavailability, as well as cross-examination or forfeiture, are not satisfied, a second analytical step is required. Admission of such a statement violates the right to confrontation if the statement is *testimonial hearsay,* as the high court defines that term." (*Sanchez, supra*, 63 Cal.4th 665, 680.)

Precisely what qualifies as "testimonial" is far from settled. The *Sanchez* court noted that the United States Supreme Court "has offered various formulations of what makes a statement testimonial but has yet to provide a definition of that term of art upon which a majority of justices agree." (*Sanchez, supra*, 63 Cal.4th 665, 687.) Exactly a year and a day before *Sanchez,* the court stated "we have discerned two requirements. First, 'the out-of-court statement must have been made with some degree of formality or solemnity.' [Citation.] Second, the primary purpose of the statement must 'pertain[] in some fashion to a criminal prosecution.' " (*People v. Leon* (2015) 61 Cal.4th 569, 603, quoting *People v. Lopez* (2012) 55 Cal.4th 569, 581 & 582.) But to return to *Sanchez*, which is still the most recent expression from our Supreme Court: "When the People offer statements about a completed crime, made to an investigating officer by a nontestifying witness, *Crawford* teaches those hearsay statements are generally testimonial unless they are made in the context of an ongoing emergency . . . or for some

15

primary purpose other than preserving facts for use at trial." (*Sanchez, supra*, 63 Cal.4th.665, 694.)

The statements singled out by defendant for challenge concern only one point—whether the CSL had at least three members in order to satisfy the statutory definition of a criminal street gang. (See § 186.22, subd. (f) quoted at fn. 8, *ante*.) The statements are these:

Officer Reina testified that he believed Anthony Salazar was a CSL member in 2008 because "he told me himself, his tattoos that he has, . . . individuals he associates with," and his criminal history. With the aid of photographs of Salazar's tattoos that were shown to the jury, Reina told the jury how Salazar explained the meaning of the tattoos.

Officer Reina testified that Joseph McClenahan had admitted that he was a CSL member. This admission was corroborated by his criminal history and Reina's personal observation of McClenahan's tattoos (photographs of which were shown to the jury). According to Reina, McClenahan was also a CSL member in 2008.

Officer Reina testified that Manuel Manzo, who is defendant's stepbrother, admitted to being a CSL member in 2008. This conclusion was the result of Manzo's criminal history and tattoos, again, photographs of which were shown to the jury. Another stepbrother, Eduardo Manzo, was also identified as a CSL member.

Officer Reina testified that Robert Ortiz was an active CSL member in 2008, based on "his self-admission during Juvenile Hall booking" and material recovered from his cell phone, which showed that he knew defendant at the relevant time. Eduardo Manzo sent Ortiz a letter while Ortiz was in jail.

Officer Reina answered a hypothetical question about Darryl Hodges with his opinion that "he would be an active participant."

Officer Palmieri, who took the stand immediately after Reina, testified that he interviewed McClenahan in San Quentin, at which time McClenahan "admitted to me that he was . . . a CSL gang member."

16

The Attorney General contends that no challenge to testimony about McClenahan or Manuel Manzo need be entertained because defendant made no timely and specific objection as required by Evidence Code section 353 to preserve the issue for review. The Attorney General also contends that the challenged parts of Reina and Palmieri's testimony did not qualify as the sort of fact-specific testimonial hearsay, and in any event any error was harmless. We agree only with the final point.

Given the distinct doctrinal shift made by *Sanchez,* we are not inclined to insist on the strictest compliance with Evidence Code section 353. An objection would most likely have been rejected on the basis of *People v. Gardeley*, *supra*, 14 Cal.4th 605, which was overruled in *Sanchez.* Nor can we treat the experts' conclusions as nontestimonial. Reina clearly gave the impression that, although gang intelligence was his general assignment and responsibility, what put him in the witness stand was what he learned from investigating *this* case. This conclusion was corroborated by Palmieri: it was *after* he started investigating the charged offenses that he began collaborating with Reina and "acquiring information." These are the defining conditions for eliciting statements that are deemed testimonial. (See, e.g., *Sanchez, supra*, 63 Cal.4th 665, 689, 694 ["information gathered during an official investigation of a completed crime"], 697 ["produced in the course of an ongoing criminal investigation"]; *People v. Livingston* (2012) 53 Cal.4th 1145, 1158–1159, citing *Davis v. Washington* (2006) 547 U.S. 813, 822.) The statements are more pointed than the "background information about which a gang expert could testify" (*Sanchez,* at p. 677), and are patently case-specific "facts . . . relating to the particular events and participants alleged to have been involved *in the case being tried*." (*Id*. at p. 676, italics added.)

Defendant does not dispute the evidence identifying him as a CSL member, nor the evidence identifying Salazar as a CSL member. So we have two of the three members necessary to satisfy the statutory requirement. Only one more is needed. But defendant does not identify any authority requiring the prosecution to satisfy the statutory definition of a criminal street gang by specifying members by name. In short, the premise of his argument does not appear sound. Thus, the undisputed testimony of Reina

17

that there were approximately ten CSL members at the time of the charged offenses would be sufficient to satisfy the statutory definition and requirement. Nor do we think it significant whether one or more of those ten was incarcerated at the time of the charged offenses, a point on which defendant places considerable emphasis, because as established in our initial opinion, the statutory definition of gang members does not require that they be in society at large. (See fn. 10, *ante*.) In any event, Reina testified that the ten were "active gang members on the street in 2008." And when defense counsel asked of Reina, "And of those approximate 10, the three that you know about for sure are my client and his two brothers,[13] correct?", Reina answered "Correct." That makes four. And the hypothetical about Darryl Hodges would provide a fifth. (See *Sanchez, supra*, 63 Cal.4th 665, 676–677, 685.)

Moreover, we note that *Sanchez* itself helps demonstrate why the error would be harmless beyond a reasonable doubt. Our Supreme Court provided several examples to illustrate the distinction between case-specific facts and proper expert testimony. One was "[t]hat an associate of the defendant had a diamond tattooed on his arm would be a case-specific fact that could be established by a witness who saw the tattoo, or by an authenticated photograph. That the diamond is a symbol adopted by a given street gang would be background information about which a gang expert could testify. The expert could also be allowed to give an opinion that the presence of a diamond tattoo shows the person belongs to the gang." (*Sanchez, supra*, 63 Cal.4th 665, 677.)

The association between criminal street gangs and distinctive group tattoos is a matter of common knowledge. (See, e.g., *People v. Ochoa* (2001) 26 Cal.4th 398, 437–439*; People v. Williams* (2009) 170 Cal.App.4th 587, 609.) Given the amplitude of testimony about the tattoos on McClenahan and the Manzo brothers, there is no question that proper hypotheticals could have been framed and answered, thereby in effect establishing them as CSL members. Thus, the *Sanchez* dispute here is more about form than substance, because the substance—gang membership—would be heard by the jury.

---

[13] An apparent reference to Manuel and Eduardo Manzo.

18

Accordingly, the receipt of the testimonial hearsay qualifies as harmless beyond a reasonable doubt. (*Sanchez, supra*, 63 Cal.4th 665, 698.)

## Instructional Error

The trial court instructed the jury with a modified version of CALCRIM No. 3426, relating to voluntary intoxication, as follows:

"You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence in deciding whether the defendant had the specific intent to deprive the other person of her vehicle either temporarily or permanently as required in Counts Two and Eleven.

"In Count Fourteen you may consider that evidence only in deciding whether the defendant acted with the specific intent to permanently deprive the owner of her property as required for robbery.

"You may also consider it in deciding whether the defendant acted with the specific intent to promote, further or assist criminal conduct by gang members, as required by the gang charge in Count Fifteen and the gang enhancement to Counts One through Fourteen.

"You may consider it in determining whether the defendant had the bias required in the hate crime enhancements alleged in Counts One and Three through Thirteen.

"A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink or other substance knowing that it could produce an intoxicating effect or willingly assuming the risk of that effect.

"In connection with the charges of kidnapping for carjacking, carjacking and robbery, the People have the burden of proving beyond a reasonable doubt that the defendant acted with the intent to deprive the other person of her vehicle. If the People have not met this burden, you must find the defendant not guilty of robbery, kidnapping for carjacking and carjacking.

"In connection with the gang charge, and with the gang enhancement, the People have the burden of proving beyond a reasonable doubt that the defendant acted with the specific intent to promote, further or assist criminal conduct by gang members. If the

19

People have not met this burden, you must find the defendant not guilty of the gang charge and/or the gang enhancements.

"In connection with the hate crime enhancement, the People have the burden of proving beyond a reasonable doubt that the defendant was motivated by bias to commit the crimes in whole or in part because of her sexual orientation or her gender.

"You may not consider evidence of voluntary intoxication for any other purpose. Voluntarily [*sic*] intoxication is not a defense to general intent crimes. Please refer to CALCRIM number 252 for the list of General Intent Crimes."[14]

Defendant contends these instructions are defective and erroneous with respect to the two counts of aiding and abetting Hodges and Ortiz when they committed forcible

---

[14] The version of CALCRIM No. 252 told the jury:

"The following crimes and allegations requires general criminal intent: Kidnapping, the lesser offense to Counts One and Two, Forcible Oral Copulation in Concert as charged in Counts Three and Eight, Forcible Oral Copulation, the lesser offenses to Counts Three, and Eight, Forcible Rape While Acting in Concert as charged in Counts Four and Six, Forcible Rape, the lesser offenses in Counts Four and Six, Sodomy in Concert as charged in Counts Five and Seven, Sodomy, the lesser offense to Counts Five and Seven, Simple Battery, the lessor offence to Counts Twelve and Thirteen and the enhancement of Personally Armed with a Deadly Weapon, Personally used a Deadly Weapon, Personally Inflicting Great Bodily Injury and Kidnapping for Sexual Offense . . . . [¶] . . . [¶]

"The following crimes and allegations require a specific intent or mental state: Kidnapping For Sexual Purposes as charged in Count One, Kidnapping For Carjacking as charged in Count Two, Forcible Oral Copulation in Concert as charged in Counts Nine and Ten, Forcible Oral Copulation, the lesser offense to Counts Nine and Ten, Carjacking as charged in Count Eleven, Forcible Sexual Penetration as charged in Counts Twelve and Thirteen, Attempted Forcible Sexual Penetration, the lesser offense to Counts Twelve and Thirteen, Second Degree Robbery as charged in Count Fourteen, Grand theft, the lesser offense to Count Fourteen and Street Terrorism as charged in Count Fifteen and the enhancements of Hate Crime and Crimes committed for the Benefit of, at the Direction of or in Association with a Criminal Street Gang. [¶] For you to find a person guilty of these crimes or to find the allegations true, that person must not only intentionally commit the prohibited act, but must do so with a specific intent and/or mental state. The act and the specific intent and/or mental state required are explained in the instruction for that crime or allegation."

oral copulation (counts nine and ten), and the two counts of kidnapping (counts one and two).[15]

To be guilty of aiding and abetting, the defendant must be shown to have the specific intent to knowingly encourage or facilitate the principal's perpetration of a criminal act. (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1123, 1131.) Because the kidnapping was to facilitate a particular purpose, each of the kidnapping counts was likewise a specific intent offense. (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1151, fn. 6 [rape]; *People v. Perez* (2000) 84 Cal.App.4th 856, 860 [carjacking].) Thus, intoxication could, if credited by the trier of fact, negate the specific intent required for conviction. (*People v. Mendoza*, *supra*, at pp. 1131–1133.)

The Attorney General does not disagree. In fact, she concurs with defendant, but nevertheless urges that there was no error, at least in the sense meant by defendant: "We agree with appellant that counts 1, 2, 9, and 10 require specific intent not addressed by the modified instruction. However, we disagree that appellant was prejudiced by the allegedly misleading sentence, because we believe the trial court erred in instructing on voluntary intoxication for *any* of appellant's crimes." (Italics added.) On this point, we cannot agree with the Attorney General that there was no basis for instructing on intoxication.

"[T]he trial judge has a duty to instruct as to defenses ' "that the defendant is relying on . . . , or if there is substantial evidence supportive of such a defense *and* the defense is not inconsistent with the defendant's theory of the case." ' " (*People v. San*

---

[15] In light of the express language of the instruction ("You may consider evidence . . . of the defendant's voluntary intoxication . . . in deciding whether the defendant had the specific intent to deprive the other person of her vehicle either temporarily or permanently as required in Count[] Two"), it is somewhat puzzling to see count two included by defendant as among those where the jury was *not* told that it could consider defendant's intoxication in determining whether he had the requisite specific intent necessary for conviction of kidnapping for the purpose of carjacking. The instruction further told the jury to consult CALCRIM No. 252, which explicitly included "Kidnapping for Carjacking as charged in Count Two" among the specific intent crimes charged. (See fn. 14, *ante*.)

21

*Nicolas* (2004) 34 Cal.4th 614, 669.) The Attorney General asserts there was not sufficient evidence that defendant was voluntarily intoxicated at the relevant times.

On this, the Attorney General appears not to appreciate that the test for this trial court duty is framed in the disjunctive. Here, as the Attorney General implicitly concedes, defendant was relying on the partial defense of intoxication, as evidenced by his requesting instruction on the issue, and further by his closing argument.[16] With neither defendant, nor Ortiz, nor Hodges taking the stand, the only relevant testimony came from Gonzalez and the victim. Gonzalez testified that before they set out to "do a couple of carjacks," defendant was so drunk he "[c]ouldn't stand straight," and the victim testified that defendant was sufficiently intoxicated that "it was difficult for him to speak."

" ' "In evaluating the evidence to determine whether a requested instruction should be given, the trial court should not measure its substantiality by weighing the credibility [of the witnesses] . . . . Doubts as to the sufficiency of the evidence to warrant instructions should be resolved in favor of the accused. [Citations.]" [Citation.]' [Citation.]" (*People v. Tufunga* (1999) 21 Cal.4th 935, 944.) The trial court obviously accepted that this testimony was sufficiently substantial to warrant instruction on intoxication. We see no basis for overturning that decision.

The record does not explain why the instruction told the jury intoxication could be considered for some crimes and enhancements but not others. "[A] trial court has no sua sponte duty to instruct on the relevance of intoxication, but if it does instruct . . . it has to

---

[16] We do not have defendant's written request for instructions, but we do have the prosecution's, which has no mention of any intoxication instruction. Similarly, there was no transcription of discussions between the court and counsel concerning instructions, only some brief remarks by the court thanking "the attorneys for the time they have devoted" to the instructions; agreeing with the prosecution's statement that defense counsel "has elected specific lesser-included offenses which meet her theory of the case and her argument in the case, and there's no other request for further lesser-included offenses by the defense"; and noting that the sole defense objection to the instructions about to be delivered was to CALCRIM No. 1401, which concerned the gang enhancement allegations.

22

do so correctly" (*People v. Mendoza, supra,* 18 Cal.4th 1114, 1134), and not incompletely (*People v. Castillo* (1997) 16 Cal.4th 1009, 1015).  Thus, by omitting any charged offense requiring specific intent, the modified version of CALCRIM No. 3426 was error.

But was the instruction prejudicial?  To determine whether it was we do not confine ourselves to the challenged instruction alone, but consider it in the context of all the instructions.  " '[N]ot every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation.  The question is " 'whether the ailing instruction . . . so infected the entire trial that the resulting conviction violates due process.' "  [Citation.]  " '[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.' "  [Citation.]  If the charge as a whole is ambiguous, the question is whether there is a " 'reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." ' " (*People v. Huggins* (2006) 38 Cal.4th 175, 192, quoting *Middleton v. McNeil* (2004) 541 U.S. 433, 437.)  We also recall what we said recently:  " 'Jurors do not sit . . . parsing instructions for subtle shades of meaning in the same way that lawyers might.  Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.' " (*People  v. Mackey* (2015) 233 Cal.App.4th 32, 108, quoting *Boyde v. California* (1990) 494 U.S. 370, 380–381.)

We do not know precisely when the victim arrived home from her job where she worked nights, but we are informed by the record that after speaking with the victim on her cell phone, her father called the victim's partner sometime between 9:30 p.m. and 10:00 p.m.  It was shortly after 10:00 p.m. when the victim reached the sanctuary of the occupied apartment.  The jury could reasonably conclude that no more than 45 minutes elapsed between when the victim stepped out of her car until she escaped from her attackers and reached safety.

23

During that 45 minutes, the victim experienced the offenses committed on the street after she parked her car; the offenses committed in her car as it was being driven to the abandoned apartment building; and the offense committed at the apartment building before defendant and the attackers fled. Excluding the three counts put at issue by defendant's contention, there were 12 felonies that, for present purposes, defendant accepts as valid. These include the specific intent crimes of kidnapping for the purpose of carjacking (count two); carjacking (count eleven); forcible sexual penetration (counts twelve and thirteen); robbery (count fourteen); and gang membership (count fifteen).

It strains credulity to think that the jury considered—and rejected—the idea that defendant's intoxication prevented him from having the specific intent necessary for kidnapping for carjacking, but would have reached the opposite conclusion on the kidnapping for the purpose of committing sexual offenses. This reasoning is reinforced by considering that the jury also found true the allegations that defendant had committed both kidnapping counts for the benefit of, at the direction of, or in association with a criminal street gang, allegations that required specific intent. (See second par. of CALCRIM No. 252, quoted at fn. 14, *ante*; *People v. Albillar, supra,* 51 Cal.4th 47, 67 ["section 186.22(b)(1) requires the specific intent to promote, further, or assist a *gang-related* crime."])

The same is true with respect to counts nine and ten, for which defendant was accused of being an aider and abettor to the forcible oral copulation committed by Ortiz and Hodges. For each of these counts the jury could only convict defendant if, according to CALCRIM No. 401, it determined that he knew that Ortiz and Hodges intended to forcibly compel the victim to orally copulate either Ortiz or Hodges, "and he . . . specifically intend[ed] to, and [did] in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime." Not only did the jury make those determinations, it further decided that for each count defendant had acted with the specific intent to further or assist a gang-related crime. Moreover, in accordance with CALCRIM Nos. 252 and 1354, the jury also decided that defendant had acted with the specific mental state of a "bias motivation" "against the victim based on the victim's

24

actual or perceived gender or sexual orientation," and "[t]he bias motivation caused the defendant to commit the alleged acts." In short, for each count the jury made three determinations that defendant had acted with specific intent or motivation, his claimed intoxication notwithstanding. It is fanciful, and far-fetched, to conceive that none of these determinations would have been made had counts nine and ten not been included in CALCRIM No. 3426.

Again, this conclusion finds additional support when considered from a different perspective. Chronologically, the forcible oral copulation in concert charges in counts nine and ten were the last to occur. The 13 preceding offenses commenced with robbery, a specific intent crime, for which defendant conceded his guilt. Then came some of the sexual offenses, the carjacking and the kidnapping, and then more sexual offenses, all of which—with the exception of the substantive charge of active gang participation (count fifteen)—the jury determined were committed with the specific intent to benefit or assist a criminal street gang-related crime. For all but the robbery, carjacking, and kidnapping counts, the jury found that defendant had acted with a specific bias motivation against the victim. Finally, proof that the jury comprehensively rejected defendant's intoxication as mitigation is shown by their rejecting every opportunity to convict him of a lesser included offense. Such a jury would not be receptive to the argument that defendant's mind was only intermittently unable to focus because of intoxicants.

We therefore conclude that the omission of counts one, nine, and ten from CALCRIM No. 3426 can be deemed harmless because " 'the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions. In such cases the issue should not be deemed to have been removed from the jury's consideration since it has been resolved in another context . . . .' " (*People v. Wright* (2006) 40 Cal.4th 81, 98), and was harmless according to any standard of prejudice. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

[[End nonpublished portion]]

**Sentencing Error**

25

Defendant was sentenced to life without the possibility of parole on each of the kidnappings (counts one and two); 15 years to life for the carjacking count (count eleven); 19 years for the robbery (count fourteen); and two years for the substantive offense of active gang participation (count fifteen). He received terms of 15 years to life for each of the forcible sexual penetration counts (counts twelve and thirteen).

On each of the remaining eight counts—the two rape counts (counts four and six), the two sodomy counts (counts five and seven), and the four oral copulations counts (counts three, eight, nine, and ten)—the trial court imposed a consecutive term of 25 years to life specified by section 667.61. The jury having found true the allegations that each of the offenses had been committed for the benefit of a criminal street gang (see fn. 1, *ante*), the trial court imposed a separate consecutive ten-year term in accordance with section 186.22, subd. (b)(1)(C)[17] to the 25 years to life term for each of the two forcible rape counts, the two forcible sodomy counts, and forcible oral copulation counts, and to the 15 years to life term for each of the two forcible sexual penetration counts. In other words, defendant was given 100 years of gang enhancements to be served consecutively to two indeterminate terms of 15 years to life pursuant to section 667.61, subdivision (b), and eight indeterminate terms of 25 years to life pursuant to section 667.61, subdivision (a).[18]

---

[17] Which, in pertinent part, provides: "[A]ny person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished as follows: [¶] . . . [¶] If the felony is a violent felony, as defined in subdivision (c) of Section 667.5, the person shall be punished by an additional term of 10 years." The subdivision further provides that "any person who violates this subdivision in the commission of a felony punishable by imprisonment in the state prison for life shall not be paroled until a minimum of 15 calendar years have been served." (§ 186.22, subd. (b)(5).)

[18] The probation officer advised the trial court of the extensive criminal history defendant had amassed by the time he was 36: "[D]efendant has twenty felony convictions, three of which are for auto theft, three for receiving stolen property, two for

26

Defendant contends that we must apply the logic of *People v. Lopez*, *supra*, 34 Cal.4th 1002 (*Lopez*) and remand for resentencing because "[t]he trial court erred when it imposed separate 10-year gang enhancements on each of ten counts carrying indeterminate life terms; instead, as to each such count, the trial court should have imposed a minimum parole eligibility term of 15 years." This appears to be an issue of first impression.

As framed by the Supreme Court, the sole issue in *Lopez* was "whether a gang-related first degree murder, which is punishable by a term of 25 years to life, carries an additional 10-year enhancement under . . . section 186.22(b)(1)(C) or, alternatively, a 15-year minimum parole eligibility term under section 186.22(b)(5)." (*Lopez*, at 1004.) The starting point of the court's analysis was that "Section 186.22, subdivision (b)(1)(C) (section 186.22(b)(1)(C)) imposes a 10-year enhancement when such a defendant commits a violent felony. Section 186.22(b)(1)(C) does not apply, however, where the violent felony is 'punishable by imprisonment in the state prison for life.' " (*Ibid*.) After examining the history and purpose of the statute, particularly the words "punishable by imprisonment in the state prison for life" in subdivision (b)(5), and its own decisions, the court concluded: "It therefore appears that the Legislature intended section 186.22(b)(5) to encompass both a straight life term as well as a term expressed in years to life (other than those enumerated in subdivision (b)(4)) and therefore intended to exempt those crimes from the 10-year enhancement in subdivision (b)(1)(C)." (*Id*. at p. 1007.)

In doing so, the court rejected the Attorney General's argument that "the phrase 'punishable by imprisonment . . . for life' in section 186.22(b)(5) is ambiguous in that it could apply to all life terms (including terms of years to life), as defendant contends, or merely 'straight' life terms, which require only a minimum of seven years  of

kidnapping [in addition to the current convictions] . . . . [¶]  He has eight misdemeanor convictions, three of which are for possessing a controlled substance and one each for assault, vandalism, receiving stolen property, hit and run, and evading police.  [¶]  As a juvenile, the court sustained one felony charge of attempted robbery.  [¶]  The juvenile court sustained four misdemeanor charges of weapon on a school campus, attempted auto theft, vandalism, and unlicensed driver."

27

incarceration before a defendant becomes eligible for parole (§ 3046). The Attorney General claims that . . . section 186.22(b)(5) applies only to straight life terms and therefore does not apply to first or second degree murder." The court similarly rejected the argument of amicus California District Attorneys Association that "section 186.22(b)(5) could apply to a term of years to life, but only as long as the minimum term is less than 15 years, and therefore does not apply to first or second degree murder." (*Lopez*, at p. 1007.)

"The more relevant legislative history, in our view, is that surrounding the enactment of the STEP Act [the Street Terrorism Enforcement and Prevention Act] in 1988, which stated repeatedly that section 186.22, former subdivision (b)(3) (now subdivision (b)(5)) applied to 'any life prison term.' " (*Lopez*, at 1010.)

"In sum, at the time the STEP Act was enacted, the predecessor to section 186.22(b)(5) was understood to apply to *all* lifers, except those sentenced to life without the possibility of parole. Contrary to the People's naked assertion, we find no indication that the voter-approved amendment in June 1998 to section 190, subdivision (e), which eliminated postsentence credits and thereby increased the MEPD [minimum eligible parole date] for first and second degree murderers, impliedly altered the meaning of 'a felony punishable in the state prison for life' in that predecessor provision. [Citation.] We likewise find no indication that Proposition 21, which reenacted the predecessor provision without substantive change and renumbered it as subdivision (b)(5), impliedly restricted its reach. Finally, we find no support for CDAA's contention that the Legislature or the voters intended the applicability of subdivision (b)(1)(C) and subdivision (b)(5) to 'shift, depending upon the current minimum parole eligibility term for murder, and whether or not section 3046 can have an effect.' We find instead that the plain language of section 186.22(b)(5) governs and therefore conclude that the Court of Appeal erred in applying the 10–year gang enhancement to defendant's first degree murder conviction." (*Lopez*, at 1010–1011.)

The Attorney General concedes that for the ten counts "application of the One Strike law made the sentence for each . . . an indeterminate life term." Nevertheless the

28

Attorney General initially labored heroically to persuade us that *Lopez* does not doom the ten-year gang enhancements.

The Attorney General first pointed to *People v. Montes* (2003) 31 Cal.4th 350 (*Montes*), arguing that it supports imposition of the ten-year enhancements. This reliance is misplaced. *Montes* plainly holds "section 186.22(b)(5) applies only where the felony by its own terms provides for a life sentence."[19] (*Id*. at p. 352.) In other words, a life term cannot be created by aggregating the imprisonment for the felony *and* an enhancement (which in *Montes* was a 25 years to life enhancement for personally inflicting great bodily injury with a firearm added to a term of seven years for attempted murder). But just as the first degree murder in *Lopez* provided for a 25 years to life term, so do "alternative sentencing scheme[s]" such as the Three Strikes law and section

_____

[19] The Supreme Court in *Montes* also spoke of the "punishable by imprisonment in the state prison" language of section 186.22, subdivision (b)(5) as being limited to "the underlying felony itself" (*Montes*, at pp. 353, 357) and "the felony provision itself." (*Id*. at pp. 358–359.) The Attorney General placed considerable stress on these formulations, the clear implication being that rape, sodomy, oral copulation, and sexual penetration do not qualify because sections 261, 286, 288a, and 289 do themselves specify that any of these offenses is punishment by a life term (e.g., "appellant was convicted of ten counts that were . . . . all felonies that by themselves are punished by determinate sentences. [Citations.] [A]pplication of the One Strike Law made the sentence for each of these counts an indeterminate life term."). The Penal Code is peppered with statutes defining crimes, with the punishment for those crimes being laid down in other statutes. The most obvious example is murder, which is defined in section 187, divided into degrees in section 189, and punished according to sections 190, 190.03, 190.05, 190.2, and 190.25. If the Attorney General was suggesting that the statutes defining and specifying the punishment for an offense cannot be read together, such an approach is patently unreasonable and unworkable. We do not believe in *Montes* the Supreme Court intended to endorse anything this impractical when it made the statement quoted in the text.

It is true that in *Montes* the Supreme Court disapproved of the Court of Appeal "look[ing] to a *different* section of the Penal Code . . . not incorporated in the language of the felony provision . . . , in order to find that the felony provided for a life term." (*Montes*, at pp. 358–359.) However, we believe this language was meant to apply to the penalty vs. enhancement dichotomy (discussed *post*), and not to situations where an offense is defined in one statute and punished according to another.

667.61 (*People v. Anderson* (2009) 47 Cal.4th 92, 102), the latter being used here to impose eight 25 years to life terms and two 15 years to life terms.

The Attorney General next saw assistance in *People v. Jones* (2009) 47 Cal.4th 566 (*Jones*), but that decision is no more helpful than *Montes*. As the Supreme Court explained: "[T]he life term imposed in *Montes* under section 12022.53 was a sentence *enhancement*, whereas in this case the life term was imposed under section 186.22(b)(4), a *penalty provision*."[20] (*Id*. at p. 577, fn. 5.) "The difference between the two is subtle but significant. 'Unlike an enhancement, which provides for an *additional term* of imprisonment, [a penalty provision] sets forth an alternate penalty *for the underlying felony itself . . . .*'" (*Id*. at p. 578.) Here, the "alternate penalty for the underlying felony itself" comes from section 677.61, making the additional 10 years under section 186.22, subdivision (b)(1)(C) indisputably an enhancement.

This was largely the approach taken in *People v. Williams* (2014) 227 Cal.App.4th 733 (*Williams*), which involved a number of 25 years to life Three Strikes sentences

---

[20] The subdivision provides: "Any person who is convicted of a felony enumerated in this paragraph committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, be sentenced to an indeterminate term of life imprisonment with a minimum term of the indeterminate sentence calculated as the greater of: [¶] (A) The term determined by the court pursuant to Section 1170 for the underlying conviction, including any enhancement applicable under Chapter 4.5 (commencing with Section 1170) of Title 7 of Part 2, or any period prescribed by Section 3046, if the felony is any of the offenses enumerated in subparagraph (B) or (C) of this paragraph. [¶] (B) Imprisonment in the state prison for 15 years, if the felony is a home invasion robbery, in violation of subparagraph (A) of paragraph (1) of subdivision (a) of Section 213; carjacking, as defined in Section 215; a felony violation of Section 246; or a violation of Section 12022.55. [¶] (C) Imprisonment in the state prison for seven years, if the felony is extortion, as defined in Section 519; or threats to victims and witnesses, as defined in Section 136.1."

This was the basis for the 15 years to life sentence for the carjacking. Concerning that count, the jury sustained the allegation that the offense was committed for the benefit of a gang, but the trial court did not impose a ten-year enhancement on top of the indeterminate term.

enhanced with 10-year enhancements under section 186.22, subdivision (b)(1)(C). The Court of Appeal construed *Lopez* to prohibit the enhancements:

"In this case, defendant received sentences of 25 years to life. These sentences of 25 years to life constitute life sentences within the meaning of section 186.22, subdivision (b)(5). [(*Lopez, supra*, at 1007.)] These life sentences resulted from the application of the Three Strikes law. The Three Strikes law is a penalty provision, not an enhancement. It is not an enhancement because it does not add an additional term of imprisonment to the base term. Instead, it provides for an alternate sentence (25 years to life) when it is proven that the defendant has suffered at least two prior serious felony convictions. . . .

"In light of *Jones's* direction that the phrases '[a]ny felony punishable by . . . imprisonment in the state prison for life' (§ 12022.53, subd. (a)(17)) and 'a felony punishable by imprisonment in the state prison for life' (§ 186.22, subd. (b)(5)) 'should be construed similarly' (*Jones*, at 577), it follows that because defendant's life sentences are the result of a penalty provision, he has been convicted of 'felon[ies] punishable by imprisonment in the state prison for life' (§ 186.22, subd. (b)(5)). The trial court therefore erred in imposing the 10-year gang enhancements pursuant to section 186.22, subdivision (b)(1)(C)." (*Williams*, at 744–745.)

The Attorney General attempts to distinguish *Williams* as "inapplicable" because it did not involve section 667.61, and because it "followed *Jones*'s penalty versus enhancement paradigm without inquiry into the objectives of the Three Strikes Law, thus failing to take into account that its decision precludes recidivists who commit violent offenses from being punished for also committing those offenses on behalf of a gang. [Citations.] This court should decline to adopt that analysis in the context of the One Strike Law. Because the STEP Act and the One Strike Law serve separate objectives, applying *Jones* without more would ignore one of the statutes even though appellant meets the criteria of both." And as for *Lopez*, the Attorney General distinguished it on the grounds that it "analyzed the language at issue for an entirely different purpose," and did not "apply" section 667.61.

31

In light of the double-handful of consecutive life terms to which defendant was sentenced under section 667.61, it can hardly be said that he is escaping punishment in any genuine sense. In sentencing defendant according to the terms of that statute, the trial court was obviously attempting to comply with the directive in subdivision (f) that defendant be sentenced in such a manner as to receive the "greater penalty." The objective of punishing violent sex offenders who have a gang connection or motivation is no less important than punishing murderers who have a gang connection or motivation. It is not soft-heartedness or myopia that led the *Lopez*, *Jones*, and *Williams* courts to reach the conclusion they all did. Those results were the product of the "plain and unambiguous" language of section 186.22 concerning what qualifies as a life term. (See *Lopez*, at 1006–1007; *Williams*, at 742.) We think *Williams* is soundly reasoned, no surprise given that its author, Justice Willhite, is a noted authority on sentencing. And we note that other authorities appear to agree. (See Couzens et al., Sentencing California Crimes (The Rutter Group 2013) ¶ 21:7, p. 21-5 (rev. 7/2015) ["The enhancement provisions of section 186.22(b)(1) may not be applied when the defendant receives a life sentence . . . ."].)

As for the junction between sections 186.22 and 667.61, and the enhancement vs. penalty distinction of *Jones*,[21] the Supreme Court already had considered it as applied to section 667.61: "[T]he One Strike law is not . . . a sentence enhancement. 'A sentence enhancement is "an *additional term* of imprisonment added to the base term." [Citation.]' ([*People v. Jefferson* (1999) 21 Cal.4th 86,] 101.) The 25-year minimum term of the One Strike law 'does not fall within [this] definition of an enhancement, because it is not an "additional term of imprisonment" and it is not added to a "base term." ' (*Ibid*. [holding that 15-year minimum term under § 186.22, subd. (b)(4), is not

---

[21] Which, we note, the Supreme Court reiterated in another decision filed on the same day as *Jones*: "Nothing in this opinion should be read as undermining the validity of the strict distinction this court has drawn in the past between sentence enhancements and penalty provisions in other contexts." (*People v. Brookfield* (2009) 47 Cal.4th 583, 595.)

an enhancement].) Rather, it 'sets forth an *alternate* penalty for the underlying felony itself, when the jury has determined that the defendant has satisfied the [statute's] conditions . . . .' (*Jefferson*, *supra*, at p. 101.) Thus, the One Strike law does not establish an enhancement, but 'sets forth an alternative and harsher sentencing scheme for certain enumerated sex crimes' when a defendant commits one of those crimes under specified circumstances. [Citations.]" (*People v. Acosta* (2002) 29 Cal.4th 105, 118.) Moreover, "relevant legislative history confirms that the Legislature did not intend the One Strike law to establish an enhancement." (*Id*. at p. 119.)

The Attorney General naturally drew our attention to two passages from that opinion: "[T]he One Strike law establishes a floor—a minimum term a qualifying defendant must serve—but does not require sentencing under the statute to the exclusion of any other sentencing provisions, or preclude imposing a total sentence that is greater than the term of the One Strike law when other factors warrant greater punishment." (*People v. Acosta*, *supra*, 29 Cal.4th 105, 124.) "[B]ecause the Three Strikes law and the One Strike law serve separate objectives, ignoring one of these statutes where a defendant meets the criteria of both would defeat one of the Legislature's objectives." (*Id*. at p. 127.) Replace "the Three Strikes law" with "the STEP Act," and the Attorney General sees the latter passage as clearly allowing the 10-year enhancements to remain on the life terms.

If these constituted the only words, or the last ones, from our Supreme Court, they would cause us to pause. But they are neither. These expressions were not made with any consideration of section 186.22, much less the impact of its subdivision (b)(5). The language precedes *Lopez*, and frankly cannot be squared with *Lopez*'s construction of subdivision (b)(5) as precluding a 10-year enhancement to a life term. If the Supreme Court meant these passages to have the meaning attributed by the Attorney General, it would have figured prominently in a *Lopez* opinion that reached the opposite conclusion.

In plain effect, because it is an alternative sentencing scheme, section 667.61 establishes penalties for specified offenses. It identifies a number of situations which, depending on the number of circumstances in aggravation, will be punished with a base

33

term of either 15 or 25 years to life. (§ 667.61, subds. (a) & (b); *People v. Anderson*, *supra*, 47 Cal.4th 92, 102.) Thus, section 667.61 addresses situations "where the felony by its own terms provides for a life sentence," meaning that section 186.22, subdivision (b)(5) does apply. (See *Montes*, *supra*, at 352.) Unlike *Montes*, this is a situation where one statute defines the crime and specifies the penalties, all of which are life terms. We reject the Attorney General's former reasoning that subdivision (b)(5) is immaterial because defendant's "ten convictions . . . were not themselves life offenses, but [only] made life offenses by the One Strike Law." (See fn. 20, *ante*.) Those ten sentences constitute terms "punishable by imprisonment in the state prison for life," language construed in *Lopez* as precluding a 10-year enhancement under section 186.22, subdivision (b)(1)(C). We are therefore compelled to conclude that the trial court erred in sentencing defendant to a consecutive 10-year term of imprisonment on each of the life terms to which defendant was sentenced.[22]

There remains the issue of remedy. In *Lopez* the Supreme Court decided that "the sentence must be modified to delete the 10-year gang enhancement imposed under Penal Code section 186.22(b)(1)(C)." (*Lopez*, at 1011.) Because the defendant in *Lopez* had been convicted of a single substantive offense, the modification could be accomplished at the appellate level. (Cf. *People v. Arauz* (2012) 210 Cal.App.4th 1394, 1405 [judgment affirmed as modified after Court of Appeal struck 10-year enhancements on two counts].) Here, however, we are dealing with a sentence enhancement attached to at least 10 counts. Perhaps in recognition of this complicating reality, defendant asks that the cause

---

[22] Nevertheless, we acknowledge that the issue was a novel and thorny one with which the court and both counsel grappled. The prosecutor stated that "it took about five district attorneys and a representative from the AG's Office to try to calculate the correct sentence for Mr. Salvador . . . ." Defendant's sentencing was originally set for February, but was continued to May so that all concerned could try to find the solution. It is clear from the sentencing hearing that the trial court's ten-page statement of reasons was written in advance and read into the record. The court erred, but it was certainly not from lack of diligence or reflection.

34

be remanded for resentencing.  The Attorney General does not oppose this procedure.[23]
We also believe that providing the trial court with a fresh opportunity for sentencing is most efficient and respectful solution.

## DISPOSITION

The sentence is vacated and the cause is remanded for the sole purpose of resentencing in accordance with this opinion.  The judgment of conviction is affirmed in all other respects.

---

[23] The careful reader may have noted that the past tense has been used with respect to the Attorney General's position on this sentencing issue.  The reason for the unusual phrasing requires explanation.  Both sides waived oral argument.  Because we were concerned that an issue of this magnitude should receive the most consideration possible, we directed the parties to present oral argument on the sentencing issue.  Upon further reflection on the matter, Senior Assistant Attorney General Jeffrey M. Laurence advised that, "after careful reconsideration," the Office of the Attorney General was withdrawing its opposition to defendant's argument.  "Instead, we agree with appellant's claim that the sentences on the counts in question are indeterminate life terms as a consequence of the application of section 667.61, and that section 186.22, subdivision (b)(5) governs.  We therefore acknowledge the trial court erred in imposing the ten 10-year terms pursuant to section 186.22, subdivision (b)(1)(C)."  We commend the Office of the Attorney General, and Mr. Laurence, for this approach to their professional responsibilities to this court and to the People of the State of California.

35

_____
Richman, J.

We concur:

_____
Kline, P.J.

_____
Stewart, J.

A142488; *People v. Salvador*

36

| | |
|---|---|
| Trial Court: | Contra Costa Superior Court |
| Trial Judge: | Honorable Susanne M. Fenstermacher |
| Attorneys for Plaintiff and Respondent: | Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Catherine A. Rivlin, Supervising Deputy Attorney General, and Roni Dina Pomerantz, Deputy Attorney General |
| Attorneys for Defendant and Appellant: | Stephen B. Bedrick, under appointment by the Court of Appeal |